Appellant was convicted for the unlawful possession of intoxicating liquor in a dry area; punishment assessed at a fine of $100.

On September 27, 1952, two members of the Police Department of the City of Denison were parked on Washington Street in that city when appellant drove by in his automobile between 30 and 35 miles per hour. They started following him and appellant increased the speed of his car to between 70 and 80 miles per hour, and ran a stop sign while the officers were in pursuit. The officers were in sight of him at all times and, after travelling some nine blocks, appellant drove into the driveway at his home with the officers stopping the police car immediatley behind appellant's in the driveway. There were two men in each car and, as the cars came to a stop, the four men got out of the cars at approximately the same time.

Louis Winchester, the driver of the police car, met appellant at the rear of appellant's car and told appellant at that time that he was under arrest. The police officers then searched appellant's car and found therein eight one-half pint bottles of whiskey, which were later introduced in evidence.

Upon the admitted absence of a search warrant, appellant contends that the court erred in admitting in evidence the whiskey found upon the search of his automobile, on the ground that the search was not authorized as incident to his arrest for a traffic violation, nor was probable cause shown authorizing such search and seizure.

The propriety of the admission of this testimony is not before us, since the appellant reserved no exception to the ruling of the court, and since the appellant proved by his own witness, Murrell Stanford, that the whiskey was in the car.

The judgment of the trial court is affirmed.

Opinion approved by the Court.

STERNENBERG v. MARSHALL et al.

No. 10122.

Court of Civil Appeals of Texas. Austin.

April 8, 1953.

Rehearing Denied April 29, 1953.

James R. Meyers, Coleman Gay, Austin, for appellant.

Zollie C. Steakley, James H. Rogers, Austin, for appellees.

HUGHES, Justice.

This is a suit for damages arising from the death of Elmo Marshall who at the time of receiving his fatal injuries was an employee of appellant F. W. Sternenberg. Appellees are the surviving wife, children and parents of deceased and the administrator of his estate.

Marshall was severely burned while using, in the course of his duties, a weed burner at appellant's lakeside lodge in Travis County on January 7, 1951. He succumbed to these injuries on March 30, 1951.

Appellees pleaded that while Marshall was so using the weed burner that the flexible fabric hose leading from the fuel tank to the nozzle broke without warning immediately releasing a quantity of kerosene oil which was sprayed by air pressure upon the person and clothes of Marshall and was instantly ignited.

Appellees charged appellant with negligence in failing to furnish Marshall with a safe weed burner with which to work and in failing to inspect and repair the same.

Appellant alleged that Marshall was guilty of numerous acts of contributory negligence, that he, Marshall, was in complete charge of the weed burner and had at least equal knowledge with appellant of its condition and that he had assumed the risk attending its use.

Findings of the jury on issues pertinent to this appeal are:

1. That the flexible hose on the weed burner, on the occasion in question, was not strong enough to withstand the pressure normally exerted in such hose in the operation of the burner. (This finding was followed by appropriate findings of negligence and proximate cause.)

2. That a visual inspection of such hose would not have disclosed its weakness.

3. That Marshall did not fail to inspect the hose.

4. That Marshall did not know of the weak condition of the hose.

It was undisputed that appellant made no inspection of the hose except a visual inspection.

Appellant's first point is that the court erred in refusing to grant his motion for an instructed verdict and for judgment despite the verdict.

Appellant bought the weed burner from the manufacturer about October 1, 1946, after receiving a manufacturer's circular reading:

"Safe—Compact—Portable

"A 7 ft. length Oil Resisting Hose with brass nipples.

"Simple, foolproof—no movable parts to get out of order. Can be operated by the most inexperienced person after reading the simple instructions sent with every outfit.

"Absolutely Safe

"Indoors                                    Outdoors

"Banish once and for all the thought that there is any danger in using an Aeroil Burner! You can use it in high or calm—indoors or outdoors—with perfect safety."

The burner, when received, was assembled by appellant and Marshall after appellant had read over the instructions to Marshall who could neither read nor write.

It was Marshall's duty to clean, oil and fill the burner and he was the only one who used it except for short periods of time when he was relieved by appellant or some member of his family.

The burner was used only two or three times a year. When not in use it was stored in a dry tool shed, the seven-foot hose lying on the floor. It was customary to burn all the fuel in the tank before storing, but otherwise the hose was not drained or cleaned of any remaining kerosene.

The burner was normally operated at a pressure of 20 to 30 pounds per square inch but it was tested to stand an operating pressure of 250 pounds and had a potential operating pressure of about 1,000 pounds.

In operating the burner air was forced into the tank causing the kerosene to flow through the hose to the torch and to vaporize. This torch is held in the operator's hands and appears to be about 18 inches long from the end of which a four-inch flame is delivered 36 inches at a temperature of 2000° F.

The 7-foot hose attached to the burner was a one-ply hose lined with a synthetic rubber called neoprene.

Concerning this substance and the hose Dr. Kenneth A. Kobe, professor of chemical engineering at the University of Texas, testified:

"* * * neoprene is a material that is quite like natural rubber in many of its properties. It probably is not quite as elastic. It has better aging, better resistance to aging, is somewhat better resistant to petroleum. Cold affects it more than it does natural rubber. There are a number of properties like that.

"Q. State, if you know, Dr. Kobe, if neoprene is commonly used in the manufacture of industrial hoses such as those that are used on weed burners, pear burners and other types of apparatus which carry a fluid, a hydrocarbon, kerosene or gasoline fluid for ignition purposes. A. Neoprene is very frequently used either alone or as a lane for hoses that are to be used to carry petroleum or petroleum fractions.

"Q. Dr. Kobe, are you familiar with the effect of the lighter hydrocarbons and particularly the effect of kerosene upon synthetic hose and particularly upon a neoprene hose? A. Yes.

"Q. Would you explain that, please? A. All hydrocarbon fluids, but particularly the lighter ones, are absorbed both by natural rubber and by synthetic rubber. Neoprene would absorb the hydrocarbon fluid like kerosene or gasoline, and under those conditions of absorbing the kerosene, it would undergo a swelling and become somewhat more porous.

"Q. State what the effect, if any, the absorption of kerosene will have upon the life and strength of a synthetic hose. A. Well, this process of swelling the rubber, and that decreases the tensile strength of the rubber, and under conditions where there would be alternate, I believe you would say, wetting and drying or swelling and then evaporation and recession to approximately previous conditions, the rubber there would become—or the neoprene would become more porous. It would be more susceptible for continued absorption of kerosene and further swelling.

"Q. What is the effect of the continual absorption of the kerosene and the continual swelling with reference

to the strength of the hose to resist pressure? A. This continued process of swelling and recession would cause deterioration of the neoprene, and it would have less strength to resist pressure."

In answering a hypothetical question based on the evidence, Dr. Kobe expressed an opinion that the hose involved here "would be safe to use for a period of two or three years, and probably that is all."

The precise question raised by appellant under this point is stated by him to be:

"The question presented by this point is whether or not, as a reasonably prudent person, appellant was charged with the knowledge possessed by an expert chemical engineer that the inside of the hose might have deteriorated from use even though the hose appeared to be perfectly sound and even though the claims of the manufacturer were that the hose was 'oil resisting' and the burner could be used 'with perfect safety'. Under the verdict of the jury appellant has been held to be negligent in furnishing the weed burner so equipped to Elmo Marshall although he thought it was perfectly safe and any information to the contrary is not a matter of common knowledge."

Appellant relies upon the general rule that a master is not an insurer of the safety of the servant and the more specific and more applicable statement of the law found in such cases as Texas & N. O. R. Co. v. Sarver, Tex.Civ.App., 113 S.W.2d 317, 319, (Dallas, writ ref.) that "There is no rule of law that imposes upon the master the duty to discover latent defects, where there is nothing to indicate that any such defect exists * * *."

It is also the law that the master has a nondelegable duty to use reasonable care in furnishing a servant with tools in such condition that he will not be endangered by ordinarily careful operation and use of them and the master must likewise exercise reasonable care in maintaining such tools in such condition. 29 Tex.Jur. p. 177.

The diligence which will amount to ordinary care must be measured by the circumstances of the case.

The circumstances here are such that in our opinion the master could not rely upon casual visual inspection of the hose as an adequate discharge of his legal duty.

Every prudent person is charged with knowledge that the ravages of time are inexorable and that all physical properties are subject to deterioration from age and use. The character of the use is most important. Here the hose was used for piping kerosene under pressure of 15 to 20 pounds. It is common knowledge that pressure tends to weaken the substance against which it is exerted. It is common knowledge too that moisture has a deteriorating effect but in addition to this appellant had special knowledge that kerosene caused injurious reactions because of the advertising circular which noted the oil resistant qualities of the hose. This was a distinct warning not only that kerosene was harmful to the hose but that the hose merely retarded or resisted but did not stop or prevent its harmful effects.

Considering the age of the hose and all other attending circumstances we have concluded that appellant's first point should be overruled. This conclusion is sustained in principle by the following authorities: Houston & T. C. R. Co. v. Patrick, 50 Tex. Civ.App. 491, 109 S.W. 1097 (writ denied); Louisiana Ry. & Nav. Co. of Texas v. Eldridge, Tex.Civ.App., 293 S.W. 901 (Dallas writ ref.); 3 Labatt's Master and Servant, 2nd Ed. Secs. 1059 and 1061.

Appellant's second point is that the court erred in holding that appellees could recover because the evidence shows that Marshall had complete charge of the weed burner and had at least equal knowledge with appellant of its condition.

Appellant testified that Marshall had complete charge of the burner and that it was his duty to see that it was kept in good shape.

Appellant relies upon the legal principle announced by the Commission of Appeals in City of Teague v. Radford, 63 S.W.2d 376, that an employee cannot recover dam-

ages for injuries which arise from defects in a thing for the safe condition of which such employee is himself responsible.

■ The testimony of appellant, the basis of this point, while not directly contradicted was wholly uncorroborated and is not of the nature which required its acceptance by the jury. The jury could very well have refused to give full weight to testimony that an illiterate employee was entrusted with full responsibility for the safety of so dangerous a tool when the lives of appellant's own family were dependent thereon.

■ Insofar as this point relates to the equality of opportunity which Marshall had with appellant to know the true condition of the burner it has been held that where, as here, the defective condition is hidden and unknown both to the master and servant the servant has not assumed the risk incident to the performance of his duties with the defective tool or appliance since it is the duty of the master to make inspection. Peck v. Peck, 99 Tex. 10, 87 S.W. 248. See Master and Servant, 29 Tex.Jur. Secs. 30a and 123.

■ The evidence here discloses that there was only one practical way of testing the hose for safety and that was to subject it to increased air pressure. There is no evidence here that Marshall knew this or was instructed to make such test. Hence there is no evidence that appellant was relieved of his responsibility of inspection.

Appellant here again reverts to the quotation from T. & N. O. R. Co. v. Sarver, supra, to the effect that the master is under no duty to discover latent defects if there is nothing to indicate a defect. In that case the court quoted approvingly from Missouri, K. & T. v. Romans, 103 Tex. 4, 121 S.W. 1104, 1105, as follows:

> "The evidence equally fails to show that the (dangerous) condition had existed so long as to justify an inference that the defendant knew, or by the exercise of any degree of diligence that could be exacted of it ought to have known, of it before plaintiff was hurt. * * *"

Just the opposite inference is justified by the evidence in this case so that the language of the Sarver case when considered with the quotation from Romans is not inconsistent with our holding here.

Appellant's third point is that the court erred in permitting appellees' expert witness, Dr. Kobe, to testify that the hose would not be safe for use for more than two or three years over his objection that such evidence would invade the province of the jury.

In support of this point appellant cites Phoenix Assurance Co. of London, Ltd. v. Stobaugh, 127 Tex. 308, 94 S.W.2d 428, Kirby Lumber Co. v. Adams, Tex.Civ.App., 291 S.W. 279 (Beaumont, writ dism. w. o. j.) and Mial v. Parkhill, Tex.Civ.App., 16 S.W.2d 1109 (Gal.).

These cases hold that a witness should not by his testimony invade the province of the jury but they are so far afield on the facts that we feel a detailed discussion of the cases is unwarranted.

■ The evidence was clearly the subject of expert opinions and it aided but in no way usurped the functioning of the jury. For a discussion of the matter see McCormick and Ray, Texas Laws of Evidence, Sec. 626–7.

■ The fourth point is that the court erred in admitting the evidence of appellees' expert witness, Lloyd B. Blackwell, in answer to a hypothetical question, that "the hose fractured somewhere in the neighborhood of the middle. * * *"

The objection was that this was not the subject of expert testimony and that it invaded the province of the jury.

Discussion of the technical questions raised will not be made because the evidence, from numerous sources, is undisputed that the hose did "fracture" or rupture near its center. The point is overruled.

■ ■ The fifth, sixth and seventh points relate to the jury argument of appellees' counsel and are briefed together. We quote from appellant's brief:

> "One of the arguments which it is claimed was improper was an er-

roneous statement of the law to the jury. The other two arguments were unfair and unwarranted criticisms of the manner in which appellant had conducted the defense of the case.

"The argument in which the law was improperly stated to the jury is in part as follows:

"'* * * A man operating an instrument like ·that and a man buying one and having· a servant use it to burn the weeds on his country place is under a responsibility, gentlemen, to see that thing is safe, and that that thing won't blow up in his face and take his life.'

"Appellant objected to the statement 'as an improper statement of law,' which objection was overruled. The appellant excepted to the Court's action and appellees' counsel then proceeded:

"'Now, in addition to that, I think that basis master-servant—now, Mr. Gay said to you gentlemen, "this is just a negligence case." Yes, he wishes it were, and he wishes you would adopt that theory. This is a case where it is admitted that a colored servant is working for the defendant, and that the master-servant relationship is here. * * *'"

No objection was made to this latter argument.

Appellant fails to advise us in what respect the statement of the law by counsel is erroneous. He does state that such argument was calculated to lead the jury to believe that appellant was liable even in the absence of negligence.

We believe this contention without substance when there is considered the following argument of appellees' counsel which followed immediately the argument quoted last above:

"* * * I repeat what I have heretofore said, that in judging the facts and in answering these questions, particularly, gentlemen, the questions on negligence and proximate cause with reference to the defendant, that you have a right to apply the test that the Court has given you in this charge, and I don't think that the argument that

Mr. Gay advanced to you that Elmo Marshall, Elmo Marshall and the defendant are side by side in intelligence, in knowledge, in duty and in responsibility with reference to this situation."

The other two arguments complained of are:

"'I feel very deeply my responsibility in this closing argument to represent the family of this colored man that was out there on that lake lodge doing what he was told to do, and I particularly feel that very deeply, in view of the cold, cynical presentation you have just heard in that defense, a presentation that is asking you to say that that ignorant negro, who couldn't even read, was as much to blame and as much responsible for his burns and death as was a man of· this type, * * * who has argued with you in calculated coldness that since Elmo isn't here and since the hose isn't here that these facts and so forth can't be disputed.'

*    *    *    *    *    *

"'There is no doubt in your mind what happened there, and to suggest to you that he cut the hose in two dragging it across rocks, suggests to you that Elmo, who had used that burner as often as he had, turned the burner on the hose and kept it there 15 or 20 seconds, as Blackwell said, to let it burn through and explode in his face. Now, gentlemen, I submit to you in all candor and in all integrity, is that the right kind of an argument and a defense in the light of the relation that existed between this colored man and this white man? * * * Now to come in and say to you that Elmo was as much responsible for blowing himself up and burning himself up, that Elmo did it by dragging it on the rocks, that Elmo did it by turning it on the hose, gentlemen, judge this basic proposition, judge these basic issues, that you must decide upon the character and integrity of that type of defense.'"

No objection was made to either of these arguments.

It is our opinion that the above argument, even if erroneous, was not so inflammatory or prejudicial as that a proper instruction from the court would not have erased any harmful effects.

Considering the record as a whole we are also of the opinion that such argument, even if improper, was not of such nature as that it probably influenced the jury to return a verdict unfavorable to appellant.

We are further of the opinion that it is impossible for us to intelligently appraise the propriety of the argument made in the absence of the argument of appellant's counsel to which reference is made.

The eighth point relates to the testimony of appellees' witness, Mr. Blackwell, whose company manufactures a weed burner, but not the one involved in this suit, to the effect that his company encourages weed burner purchasers to bring them in annually for inspection and, if needed, repairs.

Lack of materiality was appellant's objection to this evidence.

It has been held many times that an objection in general terms such as used here is insufficient to require consideration by an appellate court unless the real objection is an obvious one. 3a Tex.Jur. p. 210.

We believe, however, that the testimony was material and that the court properly overruled the only objection made to its admissibility.

The two weed burners while not identical in design were similar and both operated upon the same principle.

Expert opinion as to what was proper care of one was cogent evidence of what was proper care of the other.

The last point made by appellant is that the court erred in excluding from the evidence an advertising pamphlet published and circulated by the manufacturer of the weed burner in question. This pamphlet contained letters of endorsement and testimonials from users of the burner. Typical of the tenor of such letters is this excerpt from one of them:

"It is a very useful piece of equipment and has never given me the least bit of trouble during the ten years that I have had it."

It was not shown that appellant had seen or relied on statements in the circular prior to the injury of Marshall.

Appellees objected to admission of the pamphlet on the ground that it was hearsay evidence.

This objection was properly sustained by the trial court.

Appellant contends that the pamphlet was admissible in order to use it as a basis for cross-examination of appellees' expert witnesses, the pamphlet not being offered to prove the truth of the statements contained in it.

If the pamphlet were a standard or recognized scientific treatise on the use or care of the burners then a different question would be presented. See Gulf C. & S. F. R. Co. v. Farmer, 102 Tex. 235, 115 S.W. 260, Texas & P. R. Co. v. Hancock, Tex. Civ.App., 59 S.W.2d 313 (Ft. Worth, writ ref.).

In our opinion the pamphlet contained inadmissible hearsay evidence.

Finding no reversible error the judgment of the trial court is affirmed.

Affirmed.